## WATKINS vs UNITED STATES.

## Opinion delivered January 6, 1900.

*1.  Criminal Law—Change of Venue—Re-indictment—Waiver of Objection.*

In a criminal case where the indictment and all early proceedings were had in the proper court in the proper district, under Act Mar. 1, 1895 (28 Stat. 694), and a change of venue is taken to another court in the same district, the latter court has full jurisdiction of the case, and if the original indictment be imperfect, may use its own grand jury to correct it by returning a new indictment.  And by taking the change of venue, every objection to the territorial jurisdiction of the court, if it be within the district, is waived.  And, in any event, if there be no motion to transfer, under said Act of Cong. Mar. 1, 1895, cited supra, an indictment by any grand jury within the district, is a valid indictment.

*2.  Homicide—Self Defense—Evidence.*

In a trial for murder, when the defendant's plea is self-defense, claiming that the deceased entered the "cider-joint" where defendant was employed as bar-tender, and was the aggressor in the deadly conflict that followed, while the prosecution claims the deceased entered the place on a friendly mission and the fatal quarrel was forced upon him by the defendant as the aggressor, the guilt or innocence of the accused depends on the question, who was the aggressor; and testimony of a witness that deceased entered the place upon his invitation to take a drink, is relevant and admissible as part of the res ges tae and as tending to show who was the aggressor.

*3.  Criminal Procedure—Instructions.*

To charge the jury, in a prosecution for murder, defendant pleading self-defense, that "no gestures, however violent, irritating or provoking, amount to a considerable provocation in law," was error.

Appeal from the United States court for the Southern district.

JOHN R. THOMAS, Judge.

William R. Watkins was convicted of murder. He appeals. Reversed.

For opinion on former appeal, see 1 Ind. Ter. Rep. 364.

On the 12th day of October, 1896, the grand jury for the United States court for the Southern district of the Indian Territory, sitting at Ardmore, returned into said court an indictment against the appellant, charging him with the murder of one Wyatt Williams. Upon the indictment the defendant was convicted of murder, and sentenced to be hanged. The case was appealed to this court, and the judgment was reversed, and the cause remanded for a new trial. Thereafter a change of venue was duly ordered, and the case transferred to Pauls Valley. During the March, 1898, term of the court at Pauls Valley, for some reason not appearing in the record, but presumably because of some defect or supposed defect in the indictment, the case was referred to the grand jury at that court, which said jury afterwards returned into court a true bill of indictment against the defendant, charging him with the murder of Wyatt Williams under the same state of facts and circumstances as alleged in the original indictment. To this indictment there was filed a plea in abatement, setting up the above facts. The plea was overruled by the court, and exceptions duly saved. The trial then proceeded on the last indictment, resulting in a verdict of "Guilty, without capital punishment." Motion for new trial was filed, overruled, and exceptions saved. The defendant was sentenced to imprisonment for life and the cause was regularly appealed

to this court.   Many exceptions were taken to the admissibility of evidence and the charge of the court; those relied upon appearing in the assignments of error, which were duly filed.   The facts of the killing necessary for a full understanding of the points raised appear in the opinion.

*Henry M. Furman, Herbert & Hill, R.   W.   Dick, Ledbetter & Bledsoe, Potter, Ownby & Thomas,* and *Weaver & Weaver,* for appellant.

*W. B. Johnson,   James E.   Humphrey,* and *A.  C.  Cruce,* for the United States.

CLAYTON, C. J.   The assignments of error present 13 specifications of error.  The first 4 are the usual formal ones,— that the verdict is not supported by the testimony, that it is contrary to the testimony, that it is not supported by the law, and is contrary to law. The fifth specification of error, and the first relied upon, is, in substance, as follows:  Because the court erred in overruling the defendant's plea in abatement to the indictment, which challenged the jurisdiction of the court to try the defendant upon the indictment found by the Pauls Valley grand jury.   It is claimed that, as the homicide was committed within the jurisdiction of the court at Ardmore, all original proceedings must commence there, and that the effect of a change of venue to Pauls Valley only gave to that court jurisdiction to try the defendant upon the record sent from the Ardmore court to it;  that the Pauls Valley court had no jurisdiction, after quashing the first indictment, to present the case to a grand jury outside of the territorial jurisdiction of the court in which the offense was committed, but should either have discharged the defendant, or have remanded him to Ardmore for reindictment.   In the Indian Territory the statute has provided that there shall be three judicial districts,—the Northern, the Central, and the

Southern; but it is provided that in each of these districts there shall be four and five different places for holding courts, each of which places is designated by the statute, but the boundaries of these subdivisions are not definitely fixed. The statute provides that "the Southern district shall consist of all the Chickasaw country, and the places for holding court in said district shall be at Ardmore, Purcell, Pauls Valley, Ryan and Chickasha." Act March 1, 1895, § 1 (28 Stat. 694; Ind. T. Ann. St. 1899, § 45). The same statute— section 7 (51)—provides "that all prosecutions for crimes and offences of which the United States court in the Indian Territory shall have jurisdiction, shall be had within the district in which said offence shall have been committed, and in the court nearest or most convenient to the locality wherein it is committed, to be determined by the judge on motion to transfer the trial of the case from one court to another. * * * All cases shall be tried in the court to which the process is returnable, unless a change of venue is allowed, in which case the court shall change the venue to the nearest place of holding court within the district." The foregoing is all the statutory law bearing on the subject.

Jurisdiction. From a careful reading of the statute cited, it is obvious that all criminal proceedings in this jurisdiction must be had— First, in the district where the offense was committed; and, secondly, at the court nearest or most convenient to the locality where it was committed. And, also, if a change of venue is granted, it must go to the nearest court in the district to the one ordering the change of venue, for trial. In this case there is no question but that all the proceedings were had in the proper district; and that the change of venue was properly taken to Pauls Valley, and all of the proceedings on the first indictment were had at the proper place. Did the fact that a new indictment was returned against the defendant for the same offense at Pauls Valley constitute proceedings so far new and original as that they must be had

at the court nearest to where the alleged offense was committed? We think not. Section 2130, Mansf. Dig. (section 1473, Ind. T. Ann. St. 1899), provides, ''If there shall be, at any time, pending against the same defendant, two indictments for the same offence, or two indictments for the same matter, although charged in different offences, the indictment first found shall be deemed to be suspended by such second indictment, and shall be quashed,'' the effect of which is that the finding of the second indictment, and quashing of the first, are but a reformation of the pleadings, and have no effect upon the jurisdiction of the court. Where a change of venue is taken from one court to another, the latter one has full jurisdiction of the case. If it comes to it with an imperfect indictment, it may use its own grand jury to correct it, or do any other thing that the court from which it came could do, incident to the trial, if the case were pending there. The latter court is substantially the one of the defendant's choosing. By taking the change of venue he has waived every objection to the territorial jurisdiction of the court, if it be within the district. Gut vs Minnesota, 9 Wall. 35, 19 L. Ed. 573; Whart. Cr. Pl. § 602. But, if this 'were not true, by virtue of the statute of1895 (Ind. T. Ann. St. 1899), supra, in this jurisdiction an indictment found by any of the courts of the district, although not the nearest or most convenient to the locality where the offense was committed, would be a valid indictment; for in such case the statute declares that the place of trial shall be determined by the judge ''on mo tion to transfer the trial of the case from one court to another.'' If there be no motion to transfer, as in this case, the trial proceeds in the court where the indictment was found, and in such case the defendant will have been tried in the district where the offense was committed. That there are no constitutional objections to such proceedings is decided by the supreme court of the United States in the case of Gut vs Minnesota, supra.

*Change of Venue: Re-indictment: Waiver of Objection.*

The next specification of error relied upon is: "Because the court erred in failing to sustain the motion made by counsel for the defendant to strike out the testimony of Hank Dudley, a witness for the government, to the effect that Wyatt Williams, the deceased, had entered the house in which the killing occurred, just prior thereto, upon the invitation of said witness." It is objected—First, that this testimony is irrelevant; second, that it is hearsay evidence; and, third, that it constitutes no part of the res gestæ. The killing. occurred on the night of October 10, 1896, at the house of one Rogers, who kept therein a "cider joint." The defendant occupied the position of clerk or bartender. It was in evidence: That the defendant and the deceased were not upon good terms. That the deceased some time prior to the killing had made threats against the defendant, some of which had been communicated to him, and others that had not. That the deceased went to the cider joint where defendant was at work. He was armed with a pistol, which he carried concealed. The two got into an altercation; the defendant charging the deceased with having been instrumental in the killing of his brother, which had occurred some considerable time before. The defendant got a pistol from behind the counter and shot the deceased twice, both shots inflicting fatal wounds. The deceased fired once. It is claimed by the government that the deceased, although armed, went to the cider joint on a peaceful mission; that he had been in the habit of carrying his pistol, and was not armed for the occasion; that in the deadly conflict the defendant was the aggressor. To sustain this contention, proof was offered that deceased entered the cider joint to get a drink, on the invitation of the witness Hank Dudley; that after he entered his conduct was quiet and peaceable; that the controversy was commenced by the defendant; and that he fired into the body of the deceased one fatal shot before the deceased made any attempt to draw and fire his pistol. The

**Evidence.**

defendant's contention was that the deceased was the aggressor; that he had made previous threats, and that he came to the house armed for the purpose of instigating a difficulty; that he was in the act of drawing his pistol, with the intention of killing the defendant, when he was shot, and was only prevented from doing so because of the fact that the pistol caught in his clothes.    And the testimony of defendant's witnesses tended to establish these facts.    From the above statement of the proof, it is quite clear that the guilt or innocence of the defendant depended upon the single proposition as to who was the aggressor.    If the defendant were the aggressor, he is guilty.    If the deceased were the aggressor, the defendant is innocent.    And any competent proof which tended to throw light upon this question was relevant, and should have been admitted at the trial.    And proof of the fact is not to be restricted to the immediate occurrence at the time and place of the killing.    Any fact, however remote, which tends to show that the one or the other was the aggressor is competent.    The killing being admitted, as it was in this case, and self-defense pleaded in justification of the act, the principal fact in controversy is, was the defendant or the deceased the aggressor?    Proof that the deceased was an aggressor may not conclusively prove that the defendant was not, for both may have been;  but proof that the deceased was not an aggressor is conclusive that the defendant was, for one must have been an aggressor, and therefore any proof which tended to show the quiet and peaceable conduct of the one would tend to prove the aggressive conduct of the other.    To show that the deceased was the aggressor, it was competent to prove his previous conduct towards the defendant; his state of bad feeling towards him, if such existed; all previous threats, whether communicated or not, if any were made; whether he went to the place of conflict armed or not,—or any other fact which tended to show whether his going there was peaceable or otherwise. It was proven that a bad state of feeling had existed between

the parties. Testimony was received that the deceased had made former threats, both communicated and uncommunicated. It was established that he went to the place of the difficulty armed with a pistol. All of this testimony related to that which preceded the homicide, and was only relevant and admissible because it tended to show his state of mind at the time of the killing, with the view of showing that he was the aggressor. If this testimony is relevant and admissible for such a purpose,—and it is,—certainly any testimony which would tend to disprove such facts would be relevant, not for the purpose of vindicating the deceased, for that would be immaterial, but for the purpose of establishing the negative fact that the deceased was not the aggressor, and thereby, inferentially at least, showing the affirmative fact that the defendant was. As before stated, the whole case hinged upon the single question as to who was the aggressor. Of course, in all cases of homicide, where the law of self-defense is not interposed, and there is no question as to who is the aggressor, all of such evidence would be irrelevant, immaterial, and inadmissible; but not so in cases like this. Now, the fact that the deceased had been in the habit of carrying a pistol, if proven, would tend to show that he was not armed for the express purpose of attacking the defendant, and would be relevant and competent for that purpose; but no more so than proof of the fact that he peaceably entered the house where the homicide directly afterwards occurred, on the invitation of a third party, to prove or tend to prove that his purpose in going to the house was innocent. If he went to and entered the house armed, with the intention of raising a difficulty with the defendant, that very conduct would be an aggressive act, and the jury might well infer that he was the aggressor in the conflict that ensued; and, therefore, to rebut the presumption which would arise from that fact, proof that he came to the house and entered it at the invitation of another, for a peaceable purpose, would be

competent.   Hank Dudley's testimony on this point, in sub-
stance, was that he and the deceased went into the house to-
gether, to get a drink of cider; that the deceased entered on
the witness' invitation, and they got the defendant to wait
on them, and this was but a few minutes before the alterca-
tion began.    It is clear that the evidence is not hearsay.  No
effort is made to prove the fact by declarations of the de-
ceased, but it is simply a statement of a fact by a witness
who, above all others, must have known it,—the very man
who extended the invitation.   Some decisions from the crim-
inal court of appeals of Texas are cited and relied upon to
the effect that, unless it is shown that defendant knew the
purpose for which deceased came into his presence, the tes-
timony that he came there for a peaceful purpose is irrele-
vant.   The reasoning of that court is that in all cases of
homicide, where the law of self-defense is invoked, the jury
must be instructed that they must view the circumstances of
the killing, as to the appearances of danger, from the de-
fendant's standpoint (and this is the law), and that, inasmuch
as he could not have known of the peaceable condition of
mind of the deceased when he came into his presence, such
testimony permits the jury to view the case from a different
standpoint from that of the defendant.   The first objection
to this reasoning is that, from the very situation of the par-
ties, the invitation having been extended out of his presence,
gave the jury positive information of the fact that the de-
fendant did not know it, and therefore he could not have
been influenced by it one way or the other.   They knew he
was not aware of the fact.   Therefore by no possible process
of reasoning could they hold him more or less responsible,
or measure his conduct, so far as his judgment as to the ap-
pearance of danger was concerned, whether the fact were
proven or not.   But the object of this proof was not to show
that the defendant knew it, and therefore his conduct should
have been different, but it was offered as tending to prove

(20)

that the conduct of the deceased was not such as to justify his killing. Suppose that the proof had shown that, instead of the deceased having been invited in to take a drink, he had invited the witness in to see him kill the defendant; does any one doubt but that would have been competent proof? And yet the defendant would not have known it. There was proof offered of uncommunicated threats made by deceased. The defendant knew nothing of them. Yet they were admissible. Uncommunicated threats are never admissible, however, unless in cases of self-defense, when there is a question as to who was the aggressor, and in such cases they are only admissible as tending to prove that it was the deceased. And while it is true that the defendant is allowed to judge of the danger from his standpoint, when he does so reasonably and in good faith, yet all the facts must be placed before the jury, so that they may find whether there was any danger, either real or apparent, which would justify him in honestly and reasonably drawing such a conclusion. In all cases of homicide, where self-defense is relied on by the defendant, the whole defense stands or falls on the single question as to whether the deceased was the assailant, for there can be no case which would justify a killing on this ground unless he be; and therefore that question is before the jury from the beginning of the case to the end, and they must necessarily pass upon it. Hence any testimony tending to prove that he was or was not the assailant, whether defendant knew it or not, is relevant and admissible; and proof that he, although armed, entered the house at the invitation of another, orderly, and for a peaceable purpose, in connection with the fact that he always went armed, which was testified to, among others, by the defendant himself, does tend to show, in some degree, that the deceased was not the aggressor.

We venture the assertion that no court of reputable standing has ever gone so far as to decide that the immedi-

ate going of the deceased to the place of the homicide, and into the presence of his slayer, is not a part of the res gestae.  The declarations of Dr. Parkman, made as he was on his way to Dr. Webster's office, were admitted by the court in the celebrated case of Com. vs Webster, 5 Cush. 295. In Hunter vs State (N. J.) 1 Cr. Law Mag. & Rep. 64. the court, in speaking of the fact of the deceased going to Camden, the place of the homicide in that case, say that the act of his going was "incontestably a part of the res gestæ." And a letter that had been written by the deceased to his wife at the time he left his home was held to be admissible on the ground that it tended to show his preparation for going, and was part of that transaction, and therefore of the res gestæ.  Under the circumstances of this case, we think it clear that the fact that deceased was induced to enter the house where defendant was upon an invitation of a third party, and for a peaceable purpose, so shortly before he was slain, is admissible in proof, both as part of the res gestæ, and as tending to show that he was not the aggressor.

The seventh specification of error is:  "The court Instructions erred in giving to the jury the following instruction:  'No words of reproach, however opprobrious, or gestures, however violent, irritating, or provoking, amount to a considerable provocation, in law; and when one person willfully kills another by use of a dangerous and deadly weapon, where no considerable provocation appears and not in necessary or apparently necessary self-defense, the law declares such killing murder.' "  The objection to the foregoing charge is that the jury is told that "no gestures, however violent, irritating, or provoking, amount to a considerable provocation, in law."  Mr. Wharton, in his first volume on Criminal Law (section 455a), lays down the rule to be: "Where the evidence shows an intent on the part of the defendant to kill, no words of reproach, no matter how griev-

ous, are provocation sufficient to free the party killing from the guilt of murder; nor are indecent, provoking actions or gestures, expressive of contempt or reproach, without an assault upon the person. " It was in proof that the deceased had made threats against the life of the defendant, and that they were communicated to him prior to the killing. If these threats were really communicated,—a fact for the jury to determine,—in law the defendant may act more quickly in his self-defense than he could otherwise do. Having made a threat to kill, which threat is known to the defendant, a mere gesture upon the part of the deceased, such as throwing his hand towards a deadly weapon, as if he intended to carry his threat into execution, would, if acted upon in good faith, and in the honest belief that his life was about to be taken, and he had no other way to avoid it, entitle the defendant, if not himself the aggressor, to slay in his self-defense. But, notwithstanding the fact that previous communicated threats of the deceased were in proof, the jury was instructed that no gestures, however violent etc., amounted to a considerable provocation, in law. If the deceased should draw a knife, without any intention to kill, and, with it open in his hand, make such a gesture towards the defendant as would reasonably lead him to the belief that he intended to kill him, although technically not an assault, for there would be no intent, yet to the defendant it would be a deadly assult, presenting all of the appearances of danger which would entitle him to kill, looking at it from his standpoint; and any such acts, such as throwing one's hand to his pistol, or any other violent gesture, which, if intended, would amount to an assault, if in proof, may be used by the jury—First, to determine whether the gestures in proof were of such a dangerous and deadly character as to justify the killing as a defensive act; and, if not, secondly, whether they were sufficiently provocative to anger, if they had that effect, as to entitle the defendant to

a verdict of manslaughter. The testimony of the witness Swain was to the effect that, while defendant and deceased were talking together, deceased "reached down after his pistol, which was in his pocket; that defendant then drew his pistol and threw it down on deceased, and told him not to draw his gun"; that after a short time he again attempted to draw his pistol, but "got it hung in his breeches," and the defendant then shot him. And this is corroborated by both the defendant and a witness by the name of Skeen. It is true that other eyewitnesses testify to an entirely different set of facts; but nevertheless the defendant was entitled to a correct charge upon his theory of the case, as supported by his proof, and we think, in view of the evidence above quoted, that the charge of the court, "that gestures, however violent, do not amount to a considerable provocation, in law," was error. It is argued that this part of the charge was only intended to apply to the court's instructions relating to manslaughter, and, inasmuch as the jury found the defendant guilty of murder, that, although the charge may have been erroneous in this particular, it was harmless, and therefore not reversible error; but, if the proper charge had been given, may not the verdict have been for manslaughter, or even not guilty, on the ground of self-defense?

We have examined the other errors assigned to the charge, and, without specifically alluding to each in this opinion, find that the objections are not well taken. In all respects except the one above named, we think the charge was full, and fairly covered all phases of the case. For the error above set forth, let the judgment of the court below be reversed, and the cause be remanded for a new trial.

TOWNSEND and GILL, JJ., concur.